**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | |
| **v.** | : | **Criminal No. 05-261(RWR)** |
| **ANTHONY BARLOW,** | : | |
| **Defendant.** | : | |

**GOVERNMENT'S OPPOSITION TO DEFENDANT'S**
**MOTION TO SUPPRESS PHYSICAL EVIDENCE AND STATEMENTS**

The United States of America, by and through its attorney, the United States Attorney for the
District of Columbia, respectfully opposes the defendant's motion to suppress physical evidence and
statements.  In addition, the Government contends that the defendant has failed to make a threshold
showing of any disputed material facts; therefore, an evidentiary hearing is not required.  If this
Court grants an evidentiary hearing, the physical evidence found on the train should be admitted as
evidence because the defendant has no standing to challenge the search and seizure of the property
he abandoned.  Additionally, the defendant's statements made on the train and at the time of his
arrest should be admitted because his statements were voluntary and not made in response to a
custodial interrogation.  The Government should also be permitted to use the defendant's DNA
because the supporting affidavit established sufficient probable cause to issue the search warrant for
his  buccal cell samples.  Finally, the weapon found at the time of defendant's arrest was properly
seized.  As grounds for this opposition, the United States relies on the following points and
authorities and such other points and authorities that may be cited at a motions hearing:

**BACKGROUND**

On November 12, 2004, at approximately 11:00 a.m., members of the Metropolitan Police

1

Department's (MPD) Major Narcotics Branch, who were in plainclothes, conducted interdiction operations at Union Station in Washington, D.C.[1] The MPD officers boarded Amtrak Train 79 and spoke to passengers on that train. MPD Detective Lorenzo James spoke to the defendant, Anthony Barlow, who was seated on the train and stated he was en route to Raleigh, North Carolina. Detective James identified himself and asked the defendant if he had any luggage with him, and the defendant said that he was not traveling with any bags. The officers asked similar questions to other passengers on the train. Detective James and MPD Officer Erick Alvarado observed a blue duffel bag located in the overhead storage area immediately above where the defendant was seated. The officers asked the defendant if the duffel bag was his, the defendant said the bag was not his and that he did not know to whom it belonged. Detective James and Officer Alvarado asked each passenger in that same train car if the bag belonged to any of them. None of the passengers claimed the bag.

Once the defendant and all the other passengers in that train car denied ownership of the duffel bag, the officers searched the abandoned bag. The officers' search of the abandoned bag revealed clothing, a toothbrush, toothpaste, cell phone accessories, and a Colt MKIII .357 caliber revolver, Serial No. 19901U. The gun was loaded with six rounds of .357 ammunition. After finding the gun, the MPD officers asked the defendant if they could ask him questions slightly away from the other passengers, in the area between train cars. The defendant agreed. Once there, the officers only asked the defendant for his identification and his travel itinerary. The defendant gave the officers his identification and again claimed that he did not own the bag, stated that he was on his way to a funeral in Raleigh, North Carolina, and offered to be fingerprinted and searched. According to Detective James, the defendant appeared to be nervous and spontaneously asked if he

---

[1]Plainclothes MPD officers run these operations on buses and trains on a daily basis.

was in trouble. Detective James did not respond, and the officers seized the bag. The defendant continued on his way to North Carolina.

Detective James thereafter contacted Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) Special Agent (SA) Jeff Meixner for assistance with the firearms investigation. SA Meixner processed the firearm and the ammunition for latent fingerprints. On January 21, 2005, a magistrate judge issued a search warrant to obtain blood, saliva, and buccal (cheek) cell samples from the defendant. On or about March 17, 2005, the defendant's mouth was swabbed with a cotton swab, to obtain his DNA. On or about May 25, 2005, a DNA analysis was performed on the firearm and on the defendant's buccal cell sample. The results of the test revealed the defendant's DNA profile on the firearm, and the likelihood of a random match in the African American community is 1 in 220 million.

On December 1, 2005, Deputy U.S. Marshals (DUSM) Joe Pitruzzello, Doug McCloud, and Frederick Tessari, and U.S. Marshal Senior Inspector Brendan O'Neill executed an arrest warrant for the defendant at his mother's apartment in Brooklyn, New York. The Marshals conducted an initial sweep of the apartment and found the defendant's brother in one of the bedrooms. The Marshals continued to look for the defendant, and DUSM Pitruzzello found him on a closet floor covered by clothing. As DUSM Pitruzzello and Tessari brought the defendant from the closet floor to arrest him, they pushed clothes off of the defendant's legs and shoes. As DUSM Tessari was assisting in the apprehension of the defendant, his hand hit a hard object in a black bag hanging in the closet.

3

DUSM Tessari felt the bag and immediately recognized the barrel of a firearm inside,[2] and pulled the firearm which revealed a pistol-grip, sawed off shotgun. The Marshals took possession of the bag and the gun, and finished checking the defendant's person for additional firearms. Senior Inspector O'Neill identified himself as "police," and the defendant identified himself and spontaneously stated that he "thought he might have problems" in the District of Columbia. The defendant did not make this statement in response to any questioning. Furthermore, Senior Inspector O'Neill recalled that the defendant talked freely while being transported to the police station.

On December 8, 2005, the defendant was charged with Unlawful Possession of a Firearm and Ammunition by a Person Convicted of Crime Punishable by Imprisonment for a Term Exceeding One Year under 18 U.S.C. § 922(g)(1).

## ARGUMENT

## I.   THE DEFENDANT'S MOTION TO SUPPRESS PHYSICAL EVIDENCE AND STATEMENTS FAILS TO SHOW ANY DISPUTED MATERIAL FACTS

The Defendant has requested an evidentiary hearing to address the admissibility of the aforementioned evidence. A defendant, however, does not have an absolute or presumptive right to a hearing on every motion filed with the court. See United States v. Panitz, 907 F.2d 1267, 1273 (1st Cir.1990) (citations omitted). In determining whether to grant an evidentiary hearing, the defendant must make "a sufficient threshold showing that material facts were in doubt or dispute." Id. (citing Delaware v. Franks, 438 U.S. 154, 155-56 (1978)). The defendant's motion here fails to show any disputed material facts, relieving this Court of a need for an evidentiary hearing.

---

[2]DUSM Tessari completed shotgun refresher training the day before the defendant's arrest, and he has completed shotgun training with both the U.S. Marshal Service and the U.S. Navy.

Specifically, the defendant requests a hearing on his motion to suppress physical evidence and statements. The defendant's first contention is that MPD officers lacked probable cause to search and seize his bag found on the train. Next, the defendant argues that the statements he made to Detective James on the train and to U.S. Marshals during his arrest at his mother's apartment should be suppressed because the statements were involuntary, or in the alternative, that the statements were obtained in violation of Miranda. The defendant also moved to suppress the gun found in the bedroom closet where he was hiding at the time of his arrest. Finally, the defendant argues that the search warrant for buccal cells lacked probable cause. In support of these arguments, the defendant merely recites facts provided to him by the Government, without raising a good-faith factual issue. The defendant fails to make any factual allegations, which if established, would require relief by this Court. Therefore, the defendant's request for an evidentiary hearing should be denied. At any rate, as we show below, his cursory allegations have absolutely no legal merit.

## II.    THE DEFENDANT HAS NO FOURTH AMENDMENT STANDING TO CHALLENGE THE SEARCH AND SEIZURE OF THE DUFFEL BAG

The defendant argues that the MPD officers' search of the duffel bag, which he denied ownership of, on the train violated his Fourth Amendment rights, and that the items found in the bag should be suppressed. The Fourth Amendment protects persons from unreasonable searches and seizures. U.S. CONST. amend. IV. A defendant claiming protection under the Fourth Amendment bears the burden of showing that "his own rights were violated by the challenged search or seizure." Rakas v. Illinois, 439 U.S. 128, 131 n.1 (1978); Rawlings v. Kentucky, 448 U.S. 98, 104-05 (1980). Thus, a defendant who abandons property does not have standing to challenge the search and seizure of that abandoned property. Abel v. United States, 362 U.S. 217, 241 (1960); U.S. v. Wider, 951 F.2d 1283, 1285 (D.C.Cir.1991). Additionally, a warrantless search or seizure of abandoned

5

property does not violate the Fourth Amendment, <u>Wider</u>, 951 F.2d at 1285 (citing <u>Abel</u>, 362 U.S. at 241), and a defendant who abandons property loses an legitimate expectation of privacy in that property. <u>United States v. Thomas</u>, 864 F.2d 843, 845 (D.C.Cir.1989). To determine whether a defendant abandoned property, courts must focus on the intent of the person who abandoned the property, as well as intent inferred from words, acts, or other objective facts. <u>Wider</u>, 951 F.2d at 1285.

Here, the defendant clearly intended to abandon the duffel bag when he affirmatively denied ownership of the bag and its contents. Detective James and Officer Alvarado asked the defendant, on two separate occasions if he owned the duffel bag; the defendant denied ownership, and said that he was not traveling with any bags. When the defendant abandoned the bag, he also abandoned any legitimate expectation of privacy that he had in the bag and its contents, as well as standing to challenge the search and seizure. For these reasons, the officers' search and seizure of the abandoned bag was appropriate, and the gun and personal items found in the bag are admissible as evidence against the defendant. The defendant has failed to provide any facts to support his position, and therefore, his request should be denied.

III. **THE DEFENDANT'S STATEMENTS WERE VOLUNTARY AND NOT <u>OBTAINED IN VIOLATION OF <i>MIRANDA</i></u>**

The defendant moves to suppress two sets of statements, the first set made while he was on the train to North Carolina and the second set made at his mother's apartment in Brooklyn, New York. The defendant argues that his statements were involuntary, or in the alternative, that MPD officers and U.S. Marshals failed to inform him of his <u>Miranda</u> rights. <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966), requires that a police officer inform an arrestee of his right to counsel and his right to withhold any incriminating statements. <u>Miranda</u> only applies, however, where an individual is in

custody and is subject to interrogation. Id. at 477. A statement is voluntary as long as it is "the product of an essentially free and unconstrained choice by its maker." Columbe v. Connecticut, 367 U.S. 568, 602 (1961). Additionally, an involuntary statement must be caused by government overreaching, taking into account the accused's mental state, Colorado v. Connelly, 479 U.S. 157, 163-64 (1986), as well as his conduct, background, and experience. North Carolina v. Butler, 441 U.S. 369, 375 (1979).

### A. The November 12, 2004 Statements

#### 1. The Defendant Was Not in Custody on the Train

The defendant argues that he was in custody on the train and that the MPD officers failed to inform him of his Miranda rights. A person is in custody for Miranda purposes when he has been subject to "formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." Yarborough v. Alvarado, 541 U.S. 652, 663 (2004).

The defendant merely claims that his statements were in violation of Miranda, "because his freedom of movement was constrained by the presence of the three MPD officials." (Def. Motion at 5). That is not the test for "custody" under the Fifth Amendment, however that is the test for a "seizure" under the Fourth Amendment. "[S]eizure and custody . . . are not the same thing." Castellon v. United States, 864 A.2d 141, 153 (D.C. 2004); see also Berkemer v. McCarthy, 468 U.S. 420, 441 (1980)("respondent has failed to demonstrate that at any time between the initial stop and the arrest, he was subjected to restraints comparable to those associated with formal arrest"). As we have shown below, cases involving situations similar to the present case establish that the defendant was not in custody on the train.

In United States v. Wynne, 993 F.2d 760 (10th Cir.1993), a plain-clothes Drug Enforcement

7

Administration (DEA) Agent conducted a forty-five minute routine stop of an Amtrak passenger train. The DEA Agent noticed the defendant smoking marijuana while stopped at a station and questioned the defendant on the train about his luggage and his itinerary. Wynne, 993 F.2d at 763. The Tenth Circuit held that no reasonable person in the defendant's shoes would have viewed the brief questioning as "a curtailment of his freedom of action to a 'degree associated with formal arrest.'" Id. at 764 (citation omitted). In reaching this conclusion, the court noted that the officers did not physically restrain him, their questioning was routine and brief, and the questioning took place in a public coach in the presence of other passengers. Id. at 764.

Similarly, in United States v. Lopez, 63 F.Supp.2d 411 (S.D.N.Y. 1999), three uniformed police officers asked a defendant to step off of a train to answer a series of questions about a knife in plain view. Considering that the officers did not draw their guns, raise their voices, or make threatening gestures, the court found that the defendant was not in custody for Miranda purposes. Lopez, 63 F.Supp.2d at 412.

Under the analogous circumstances of this case, the defendant was also not in custody. The MPD officers on the train were conducting a routine sweep of an Amtrak passenger train. Like the law enforcement officers in Wynne and Lopez, the MPD officers here asked only brief investigatory questions. Although the MPD officers did ask the defendant to step between two train cars to ask him investigatory questions, these actions were purely voluntary at the control of the defendant, and their actions were no different than the officers' actions in Lopez and in Wynne - the questioning occurred in public, and there is no evidence that the officers raised their voices or made threatening gestures. Furthermore, it is clear that the defendant was free to leave, because the officers allowed him to continue on his way to North Carolina. Therefore, the facts support the conclusion that the

defendant was not in custody on the train, and accordingly, <u>Miranda</u> does not apply.

### 2. At Any Rate, The officers' Initial Questions On The Train Did Not Amount To  Interrogation

Even if this Court were to disagree with the above analysis and somehow conclude defendant was in custody when the officers briefly spoke to him between cars, the defendant was not interrogated on the train.  Interrogation for <u>Miranda</u> purposes includes express questioning, as well as "any words or actions on the part of police . . . that the police should know are reasonably likely to elicit an incriminating response."  <u>Rhode Island v. Innis</u>, 446 U.S. 291, 301 (1980).  However, initial investigatory questions are appropriate and are "a material indicator" that the police are still investigating and have not begun a custodial interrogation.  <u>United States v. Allen</u>, 390 F.2d 476, 479 (D.C. Cir.1968) (an officer's question - "who beat you?" - upon seeing two men who had engaged in a fight, was appropriate as part of initial investigatory questioning); <u>see also</u> <u>United States v. Gorrell</u>, 360 F.Supp.2d 48, 53-54 (D.D.C. 2004) (asking an arrestee whether there was anything the officer "should know about" was not likely to evoke an incriminating response).

Here, Detective James simply asked the defendant if he had any luggage with him, the same question that Detective James asked other passengers on board the same train car.  Detective James' initial question was similarly not one that would be likely to elicit an incriminating response, nor is does it indicate the start of a custodial interrogation.  Additionally, the defendant does not claim that the same question posed to the train's other passengers were interrogations, further undermining his argument that the MPD officers interrogated him on the train.

Finally, the defendant's statements were also voluntary.  The defendant provides no facts that tend to show that the MPD officers used physical force or mental coercion to force him to make any incriminating statements.  On the contrary, the defendant asked the MPD officers if he was in

trouble. Also, the police asked the defendant if he would accompany them to another area of the train, clearly giving the defendant the right to refuse. There was no indicia of coercion, threats, or forced used by the police. Because the defendant's statements were not the product of a custodial interrogation and because there are no facts to support his claim that the statements were involuntary, the defendant's motion to suppress these statements should be denied.

**B. The December 1, 2005 Statements**

**1. The Defendant's Statements When He Was Arrested Were Voluntary And Not the Product of Custodial Interrogation**

The defendant also moves to suppress statements that he made during his arrest at his apartment in Brooklyn. In his motion, the defendant fails to specify the statement(s) he moves to suppress. According to Senior Inspector O'Neill, the defendant spontaneously said upon his arrest that he "thought he might have had problems" in the District of Columbia. While the defendant was in custody when the Marshals arrested him, they did not ask him anything, except to ask him for his identification. The Marshals never questioned the defendant, therefore there was no interrogation. The defendant again fails to set forth any facts that show that the Marshals initiated questioning him and accordingly, his motion to suppress the statements he made in the apartment should be denied.

**IV.    THE AFFIDAVIT IN SUPPORT OF THE SEARCH WARRANT ESTABLISHED SUFFICIENT PROBABLE CAUSE TO OBTAIN A BUCCAL CELL SAMPLES FROM THE DEFENDANT**

The affidavit supporting the search warrant for the defendant's buccal cell samples established sufficient probable cause to issue the search warrant. When reviewing a search warrant for suppression of evidence obtained pursuant to that warrant, a reviewing court should give great deference to the issuing magistrate's judgment, ensuring that the magistrate has "a 'substantial basis for . . . concluding' that probable cause existed." Illinois v. Gates, 462 U.S. 213, 238 (citation

10

omitted). Moreover, the reviewing court must look at the "totality of the circumstances" when determining whether the facts contained in the affidavit establish a substantial probability that the items sought will be found in the area to be searched. Gates, 462 U.S. at 230.

Here, SA Meixner's affidavit provided more detailed facts than the defendant includes in his motion. In the affidavit, SA Meixner notes that after the defendant denied ownership of the bag, the duffel bag was directly over the defendant's head in the luggage rack, and Detective James and Officer Alvarado asked other passengers in that train if the bag belonged to them. The affidavit also states that Detective James and Officer Alvarado noticed that the defendant was acting nervous and asked the officers if he was in trouble. The defendant's conduct and his statements gave the MPD officers reason to believe that the bag belonged to the defendant, and the officers turned the bag and its contents over to SA Meixner for further investigation. The abandoned bag, the location of the bag to the defendant, coupled with the defendant's conduct (specifically, his nervousness during the encounter), gave SA Meixner reason to believe that the DNA obtained from the defendant would match the DNA found on the gun, and a neutral magistrate found that these facts constituted sufficient probable cause to issue the search warrant. The Defendant's motion to suppress as evidence his buccal cell samples should therefore be denied.

## V.    THE SHOTGUN RECOVERED IN THE CLOSET WHERE THE DEFENDANT WAS RECOVERED AS A SEARCH INCIDENT TO ARREST

The defendant contends that the recovery of the shotgun by the marshals when they arrested him was part of an illegal search. (Def. Motion at 6).[3] When the defendant was properly arrested, the weapon was within his reach and therefore, was part of the search incident to arrest.

---

[3]    The defendant does not challenge the validity of the arrest warrant.

Searches incident to arrest are a well established exception to the warrant requirement to the Fourth Amendment. See, e.g., Michigan v. DeFillippo, 443 U.S. 31, 35 (1979); United States v. Robinson, 414 U.S. 218 (1973); Chimel v. California, 395 U.S. 752, 762-63 (1969). A valid arrest warrant carries with it the authority to enter the home of the person to be arrested, assuming there is reason to believe the person may be inside. Payton v. New York, 445 U.S. 573, 602-03 (1980).

Once inside the residence, other parameters of search and seizure law apply, including search incident to arrest. Search incident to arrest is allowed of a bag or container initially observed in close proximity to a defendant, even though officers have separated the suspect from the container to be searched. United States v. Han, 74 F.3d 537, 542 (4th Cir. 1996). "When the container is within the immediate control of a suspect at the beginning of an encounter with law enforcement; and when the officer search the container at the scene of the arrest, the Fourth Amendment does not prohibit a reasonable delay . . . between the elimination of the danger and the search." Id. at 543. See, also, United States v. Tavolacci, 895 F.2d 1423, 1429 (D.C. Cir. 1990)(search of a suitcase beyond the reach of the arrestee at time of search was permissible); United States v. Mason, 523 F.2d 1122, 1126 (D.C. Cir. 1975)(arrestee three to four feet from closet and handcuffed did not preclude a search a suitcase in the closet).

In the instant case, the facts are even more compelling. As DUSM Tessari was brushing clothes off the defendant and extricating him from the closet floor the DUSM noticed a black bag hanging in the closet. The black bag was within an arms reach of the defendant. The DUSMs were in the midst of handcuffing the defendant at this time. DUSM Tessari felt the bag and it became immediately apparent to him that there was a weapon in the bag. The DUSM had one hand on the

12

defendant and was able to reach the black bag that the shotgun was in.[4] Certainly the shotgun was

in the immediate control of the defendant, and it was searched during the arrest of the defendant.

Based on the foregoing, the shotgun was properly recovered by the law enforcement officers.

### CONCLUSION

The Government respectfully requests that this Court deny the defendant's request for an

evidentiary hearing and deny his motion to suppress physical evidence and statements.

Respectfully submitted,

KENNETH L. WAINSTEIN
UNITED STATES ATTORNEY


By:    _____

ANTHONY SCARPELLI
Assistant United States Attorney
D.C. Bar No. 474711
Organized Crime and Narcotics Section
555 4th Street, N.W. Room 4816
Washington, D.C. 20530
(202) 353-1679

---

[4]    The weapon was also recovered pursuant to the "plain touch" doctrine.  Based upon the feel, shape  and contour of the shotgun, it made the incriminating nature immediately apparent.  See, e.g., United States Raymond, 152 F.3d 309, 312 (4th Cir 1998)(seizure of crack during protective sweep valid under plain touch doctrine because of the "contour" and "mass" of drugs made their incriminating nature immediately apparent; United States v. Coleman, 969 F.2d 126, 131-32 (5th Cir. 1992)(seizure of a gun valid under plain touch doctrine because officer lawfully put hand on pouch during protective search for weapons and nature of ite was immediately apparent).

13

<u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a copy of the foregoing was served by mail upon the attorney for the defendant, Rita Bosworth, Assistant Federal Public Defender 625 Indiana Avenue, N.W., Suite 550, Washington, D.C. 20004, the 17th day of February, 2006.

_____
ANTHONY SCARPELLI
ASSISTANT UNITED STATES ATTORNEY

14